## AFFIDAVIT IN SUPPORT OF APPLICATION
## UNDER RULE 41 FOR SEARCH WARRANTS

I, Special Agent Christian Louis Cavaliere, first being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search and seizure of items enumerated in Attachment B, which are to be found at the addresses/locations listed in Attachment A.

2.     I am a Special Agent with the Drug Enforcement Administration (DEA), United States Department of Justice, and I have served in that capacity since March, 2019. I am currently assigned to the Provisional Task Force Group with the Columbia Division of the DEA in Columbia, South Carolina. As a Special Agent of the DEA, I am authorized to conduct investigations and make arrests for violations of Title 21 of the United States Code. I have participated as a Case Agent and Co-Case Agent in multiple narcotics investigations, which have used many enhanced investigative techniques such as Title III wire intercepts, search warrants, and forensic examinations of electronic devices. I have been the Affiant for numerous search warrant applications. As an Investigative Agent, I have received advanced specialty training in areas including the interception of telephone communications, fundamentals of telecommunications, electronic forensics, data analysis, and cellular analysis, as well as having received extensive training in advanced narcotics investigations.

3.     Through my training, education, and experience, I have become familiar generally with the manner in which illegal drugs are imported and distributed, the method of payment for such drugs, and the efforts of persons involved in such activity to avoid detection by law

1

enforcement. Additionally, I have received training, both formal and informal, in the operation of drug trafficking, money laundering, and wiretap investigations.

4.     Based on my training, experience, and participation in narcotics investigations, I know that:

a.  Drug traffickers and members of criminal enterprises often hold assets in false names to conceal any connection between such asset and themselves, attempting in this way to avoid detection of their illegal activities by law enforcement agencies.

b.  Although their assets are held in false names, drug traffickers use and enjoy the assets, exercising ultimate dominion and control over such assets.

c.  Drug traffickers must maintain ready access to large amounts of cash in order to maintain and finance their ongoing drug business.

d.  Because drug trafficking on the scale revealed in this investigation is frequently a continuing activity which spans many years, because the traffickers' inventory of controlled substances fluctuates depending on availability and demand, and because drug traffickers commonly front drugs, or provide them on consignment, to their customers, the traffickers often maintain books, receipts, notes, ledgers or some other type of records reflecting such transactions. Drug traffickers and members of criminal enterprises must keep their records in some secure, yet readily accessible, place where they can be used and maintained, such as in homes, offices, places of business, automobiles, safes, or safe deposit boxes. Drug traffickers and members of criminal enterprises must keep these records of their illegal activities beyond the time during which controlled substances are actually in their possession, so that they can maintain contact with their criminal associates for future drug transactions, and so that they can

2

keep records of prior transactions for which they might be owed or owe inventory or money.

e. Drug traffickers and members of criminal enterprises commonly hide controlled substances, drug proceeds, and records of their drug transactions in secure locations, such as those mentioned in paragraph (d) above, as well as in offices or places of business, garages, or storage buildings. Similarly, the traffickers and members of criminal enterprises have ready access to these items, and attempt to conceal them from law enforcement agencies.

f. Drug traffickers and members of criminal enterprises conceal controlled substances, currency, financial instruments, documents relating to financial transactions, precious metals, jewelry, other items of value, and proceeds of drug transactions, all of which constitute evidence of drug trafficking activities  Additionally, such items constitute evidence of transactions establishing the generation, transfer, concealment, and expenditure of large sums of money made from trafficking in controlled substances. Like the items mentioned in paragraph (d) above, traffickers maintain these items in secure, yet convenient, locations, such as their homes, offices, and places of business, garages, storage buildings, automobiles, and safe deposit boxes.

g. Drug traffickers and members of criminal enterprises commonly maintain addresses or telephone numbers in cellular telephones, books, or papers which reflect names, addresses, and telephone numbers for their drug trafficking and money laundering associates. These items are sometimes in code.

h. Drug traffickers and members of criminal enterprises frequently have photographs and video recordings of themselves, their associates, their property, firearms, and controlled

substances, which are usually maintained in their homes, offices and places of business. Such photographs and video recordings constitute evidence of their drug trafficking, establishing their connection with items of property, with each other, and with drugs and firearms.

i.  Drug traffickers and members of criminal enterprises involved in importation or transportation of controlled substances from source cities generally possess documentation, such as telephone records, correspondence, shipyard receipts, wire transfers, airline ticket receipts, and the like, which pertain to the acquisition, transportation, shipment, receipt of, or payment for, controlled substances, which is evidence of the traffickers' participation in the illegal drug scheme.

j.  Drug traffickers and members of criminal enterprises often maintain some record of the movement of money, whether it is accomplished by wire or interbank transfer or by a person acting as a courier. Such records, even though they may be in code, are evidence of the traffickers' illegal activities.

k.  Drug traffickers and members of criminal enterprises often use false or fictitious names or corporations or other business entities to launder their drug proceeds and to send shipments of cash or controlled substances through the mail or other delivery services. Traffickers or their Agents sometimes use banks to launder the proceeds from their illegal activities. Funds are frequently transferred between banks and various accounts to conceal their sources and origins. It is also common for them to conduct transactions in amounts to avoid the necessity of filing currency transaction reports. Documents or records of any kind reflecting any connection with any such entity or transaction constitute evidence of the trafficker's participation in the illegal scheme.

l. Drug traffickers and members of criminal enterprises frequently utilize a continuing pattern of activities to launder and conceal drug-generated proceeds and assets, which lasts over a period of years. Drug traffickers use these patterns or schemes to create the appearance of legitimate income so that they can eventually convert the proceeds or assets to themselves or to a false name under their control. In this way, the traffickers and members of criminal enterprises can enjoy and use their property while attempting to conceal the illegal activities which generated the proceeds or assets.

m. Courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, which includes trafficking in controlled substances and illegal schemes to conceal drug-generated proceeds.

n. Drug traffickers and members of criminal enterprises who deal in illegal controlled substances often use cellular telephones to maintain contact with and receive messages from their customers and suppliers to further drug distribution activity.

o. Drug traffickers and members of criminal enterprises often possess and maintain firearms, ammunition, bulletproof vests, and other tools of drug trafficking in their homes and stash locations to protect their drugs and illegal proceeds. The firearms and ammunition are used in violation of Title 18, United States Code, Section 924(c), and are considered tools of the drug trade.

p. In addition, I know from previous searches of residences and stash locations of drug traffickers that they often have items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other Agents, officers and witnesses. This affidavit is

intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.    I have participated in the investigation set forth below. As a result of my personal participation as a lead case agent in this investigation, through interviews with, and analysis of, reports submitted by DEA Special Agents, Task Force Officers (TFOs), and an analyst assigned to our DEA Enforcement Group, as well as other federal, state and local law enforcement personnel, I am familiar with all aspects of this investigation. Statements contained in this affidavit are based in part upon information provided by Special Agents and TFOs assigned to the DEA Columbia District Office (CDO) Provisional Task Force Group One (TF-1), information provided by Investigators with the Richland County Sheriff's Department (RCSD) narcotics unit, information provided by other local law enforcement, information provided by cooperating defendants and confidential sources, pen register and telephone toll analysis, public source information, controlled purchases of controlled substances, and upon my own training and experience. I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish the foundation for an order authorizing the search of the below-referenced locations.

7.    The following paragraphs are furnished to establish probable cause in support of the search warrants.  I am familiar with this investigation through personal knowledge and through other law enforcement officers.  I have good reason to believe and do believe that all of the information provided to me and contained herein is credible and true.  I have asserted belief statements throughout this affidavit.  These belief statements are based on my training and experience involving complex investigations into criminal enterprises to include violent street gangs, and high-level drug traffickers.

## PROPERTIES TO BE SEARCHED

8.      I am seeking authority to search the following **TARGET LOCATIONS**:

a.   302 Clinton Street, Columbia, South Carolina, 29223[1] (hereinafter referred to as the
**DISTRIBUTION LOCATION**), where I submit there is probable cause to believe
Travis MCKIE, a/k/a "Trav," a/k/a "Rav," distributes cocaine, crack cocaine,
methamphetamine, heroin, and marijuana with other members within the MCKIE
DTO. Controlled purchases, confidential source information, cooperating defendants,
surveillance, wire intercepts and location data records confirm that MCKIE and other
co-conspirators use the **DISTRIBUTION LOCATION** to distribute cocaine, crack
cocaine, methamphetamine, heroin and marijuana. Specifically, Agents believe
MCKIE distributes his drugs within the residence and on the property surrounding the
residence. Agents believe that MCKIE uses vehicles and other structures on the
property to hide controlled substances and the proceeds thereof. Based on the
investigation to date, evidence shows there is probable cause to believe other members
of the MCKIE DTO practice the same drug distribution methods at the
**DISTRIBUTION LOCATION**.

b.   304 Fowler Street Columbia, South Carolina, 29223,[2] (hereinafter referred to as the
**STASH HOUSE**), which I believe is the residence of Kamaleh WILSON, MCKIE's
girlfriend and unindicted co-conspirator. I submit through surveillance, intercepted

---

[1] MCKIE listed 302 Clinton Street as his residence with the South Carolina Department of Motor
Vehicle (SC DMV), as well as his location to be reached by his (MCKIE's) bond company.

[2] Kamaleh WILSON listed 304 Fowler Street (the **STASH HOUSE**) as her residence with the
SC DMV, and her vehicle, a  black 2009 Nissan Altima displaying South Carolina tag TJV683,
is registered there as well.  Agents have observed the Nissan at the **STASH HOUSE** on multiple
occasions.

telephone calls and controlled purchases, there is probable cause to believe that MCKIE uses the **STASH HOUSE** to store large quantities of controlled substances for later distribution. Agents have observed MCKIE go to the **STASH HOUSE** to acquire large quantities of methamphetamine.

c.  522 NE Shady Grove Road, Lugoff, South Carolina, 29078, (hereinafter referred to as the **COUNTRY RESIDENCE**) which I submit there is probable cause to believe is the primary residence for MCKIE.  Agents have identified through surveillance and intercepted calls that MCKIE is using the **COUNTRY RESIDENCE** as his (MCKIE's) personal residence. Agents also confirmed through intercepted telephone calls that MCKIE used the **COUNTRY RESIDENCE** to store controlled substances as well. The investigation has shown there is probable cause to believe that MCKIE himself, or a co-conspirator at the direction of MCKIE, brought controlled substances from the **COUNTRY RESIDENCE** to the **STASH HOUSE** so that he (MCKIE) could distribute the controlled substances to customers at the **DISTRIBUTION LOCATION**.

## BACKGROUND INFORMATION

9.      On February 24, 2021, a RCSD Source of Information[3] (SOI) met with TFO Henry Owens and RCSD Lt. Ricky Johnson to provide information regarding the drug trafficking

---

[3] The RCSD SOI is a cooperating source of information who has provided law enforcement with information on a prior joint DEA and RCSD case. After the SOI's information was corroborated by law enforcement and following the introduction of a confidential source (CHS-1) the RCSD SOI received payment from the RCSD. Agents corroborated the information provided on February 24, 2021, with previously known intelligence related to **TARGET TELEPHONE 1**. Agents found that **TARGET TELEPHONE 1** was involved in a prior joint FBI/DEA investigation into Anthony BRITT, discussed later in this Affidavit Agents used intelligence gathered in the BRITT investigation to corroborate the RCSD SOI's information.

8

activities of MCKIE. According to the RCSD SOI, MCKIE is an ounce level crack cocaine and methamphetamine supplier in the Columbia, SC area. The RCSD SOI informed TFO Owens and Lt. Johnson that the RCSD SOI could introduce other buyers to MCKIE, to purchase crack cocaine and methamphetamine. During the interview, the RCSD SOI provided 803-587-4214 as the telephone number that MCKIE uses to coordinate drug transactions (**TARGET TELEPHONE 1**.) Since February 24, 2021, Agents have conducted eight controlled purchases from MCKIE, using a DEA Confidential Human Source[4] (CHS-1[5]).

10.    CHS-1 began providing information relevant to this investigation on March 2, 2021, after the above referenced RCSD SOI introduced CHS-1 to MCKIE. CHS-1 is currently in a position to observe and interact with numerous individuals that are affiliated with various DTOs in Columbia, SC. I have corroborated information provided by CHS-1 through toll analysis, controlled purchases using audio and/or video surveillance equipment, and physical surveillance. CHS-1's information has proven to be credible throughout CHS-1's association with the DEA TF-1, the Federal Bureau of Investigation (FBI) Columbia Violent Gang Task Force (CVGTF), and the RCSD.

---

[4] CHSs are generally an individual seeking some sort of beneficial gain from the Government or law enforcement as they provide information or conduct other actions on behalf of the Government. CHSs often work for money and/or seek a benefit in relation to pending criminal charges. CHSs are vetted and monitored on a continuous basis until deactivation by law enforcement agencies and are made to adhere to certain regulations while being used to further an investigation. SOIs are usually an individual, either anonymous or overt, who provides law enforcement officials with information regarding criminal activity. SOIs often work with law enforcement without compensation.

[5] CHS-1 has been a long-standing confidential source for the DEA TF-1, FBI CVGTF, and the RCSD. CHS-1 has assisted in numerous federal and state investigations. CHS-1 has no pending charges and is operating as a paid CHS. All information provided by CHS-1 has been corroborated by law enforcement. CHS-1's assistance and information provided in this investigation and others has proven to be reliable.

11.    As the investigation progressed, on May 10, 2021, the Honorable J. Michelle Childs, United States District Court Judge for the District of South Carolina, signed a Court Order authorizing the original interception of wire and electronic communications occurring to and from MCKIE's **TARGET TELEPHONE 1**. On June 10, 2021, Judge Childs signed an extension to the original 30-day interception of wire and electronic communications over **TARGET TELEPHONE 1**. During the interception of **TARGET TELEPHONE 1**, in conjunction with surveillance, and controlled purchases, Agents identified a number of MCKIE's co-conspirators, learned their roles within the MCKIE DTO, and identified the above-referenced **TARGET LOCATIONS** as well as their association to the MCKIE DTO. I submit the probable cause listed below will show that these three **TARGET LOCATIONS** are being used to distribute, store and manufacture drugs and the proceeds thereof.

## PROBABLE CAUSE

### DISTRIBUTION LOCATION
(302 Clinton Street, Columbia, South Carolina 29223)

### STASH HOUSE
(304 Fowler Street, Columbia, South Carolina 29223)

12.    During the course of the investigation, MCKIE referred to his **DISTRIBUTION LOCATION** as "Off of Hardscrabble," "Mamma's House," "The Hood,"[6] and other coded terms. The **DISTRIBUTION LOCATION** is the primary location where MCKIE distributes drugs to

---

[6] MCKIE often advised buyers of his location by saying he was "Off Hardscrabble." Hardscrabble is Hardscrabble Road, Columbia, South Carolina; Clinton Street, where the **DISTRIBUTION LOCATION** is located, runs into Hardscrabble Road. This is MCKIE's way of letting his buyers know that he is at the **DISTRIBUTION LOCATION**. Agents believe that MCKIE's mother lives at the **DISTRIBUTION LOCATION.**, as MCKIE sometimes refers to the **DISTRIBUTION LOCATION** as "mama's house." MCKIE also refers to the **DISTRIBUTION LOCATION** as "the Hood," while referring to his own residence as "the Country."

his customers. Agents have conducted eight controlled purchases from MCKIE at the **DISTRIBUTION LOCATION**, with the last controlled purchase being conducted on May 17, 2021. From May 11, 2021, to July 10, 2021, Agents intercepted wire and electronic communications over **TARGET TELEPHONE 1**. During the intercepted telephone calls on **TARGET TELEPHONE 1,** MCKIE consistently met buyers at the **DISTRIBUTION LOCATION** to distribute drugs, and, on several occasions, would pick the drugs up at the **STASH HOUSE** before meeting the buyers at the **DISTRIBUTION LOCATION**.

### MAY 17, 2021 CONTROLLED PURCHASE[7]

13.     On May 17, 2021, at approximately 3:25 pm, TFO Owens and SA Christian Cavaliere met with Agents from the DEA and RCSD at a pre-determined meeting location and conducted an operational and safety briefing in reference to the controlled purchase of methamphetamine from MCKIE. Prior to the operational and safety briefing, Agents established surveillance on MCKIE. Surveillance units observed MCKIE drive from his residence (the **COUNTRY RESIDENCE**) to MCKIE's **DISTRIBUTION LOCATION**. Surveillance units observed MCKIE driving a Ford Crown Victoria bearing SC license plate SZG313.[8] Surveillance units maintained surveillance of MCKIE while other law enforcement officers met with SA

---

[7] All controlled purchases were conducted in the same manner for consistency. Before each controlled purchase, CHS-1 and CHS-1's vehicle are searched for contraband and money. Once it is determined that there is no money or contraband in CHS-1's possession or in CHS-1's vehicle, CHS-1 is provided with United States currency to conduct the drug purchase. CHS-1 is also provided audio and video surveillance recording equipment. Once CHS-1 has completed the drug transaction, all the recording equipment and drug evidence is recovered by law enforcement officers. CHS-1 and CHS-1's vehicle are once again searched to determine there is no additional contraband or money. CHS-1 is then debriefed about the transaction.

[8] SA Cavaliere conducted a database check in reference to South Carolina license plate SZG313. According to the South Carolina Department of Motor Vehicles South Carolina license plate SZG313 is registered to a 2004 Ford F250 at 302 Clinton St., Columbia, South Carolina, belonging to James Perry ARTHUR. ARTHUR is an identified co-conspirator of MCKIE's and drug dealing/business partner.

Cavaliere and TFO Owens in reference to the controlled purchase of methamphetamine from MCKIE.

14.    At approximately 3:50 pm, RCSD Deputy Lloyd Dunham observed MCKIE depart the **DISTRIBUTION LOCATION**. Surveillance of MCKIE was maintained. At approximately 3:55 pm, RCSD Deputy Dunham observed MCKIE arrive at an apartment complex off of Sloan Road, Columbia, SC, in the vicinity of 116 Sloan Road. Shortly after MCKIE arrived, RCSD Deputy Dunham observed a heavy-set, light-skinned black male walk up to the driver's side of MCKIE's brother's Ford Crown Victoria, lean into the car, and then walk back into the apartment complex. Based on my training, experience, knowledge of this investigation, and the brevity of the interaction between MCKIE and the unidentified male, I believe that MCKIE's behavior at the apartment complex was indicative of a drug transaction.

15.    At approximately 3:57 pm, RCSD Deputy Dunham observed MCKIE depart the apartment complex. Shortly after MCKIE's departure, CHS-1 placed a controlled telephone call to MCKIE at the direction of law enforcement and in the presence of law enforcement. At approximately 3:59 pm, CHS-1 placed a controlled telephone call to MCKIE on **TARGET TELEPHONE 1** (Session #519) as witnessed by TFO Owens and SA Cavaliere. A synopsis of the telephone conversation is below.

- CHS-1 said: "Trying to run it to you."

- MCKIE responded: "Yeah, yeah, what's up? What's the number?"

- CHS-1 responded: "Three."

- MCKIE responded: "Ok."

- CHS-1 responded: "Hey, if it's alright I might just get six, but I'm going to try the three first."

12

- MCKIE responded: "It's on you, whatever you decided."

- CHS-1 responded "Alright, I'll see you in a little while."

- MCKIE responded "Ok."

- CS responded: "Same spot? Hey what's the number?"

- MCKIE responded: "Same thing, just add it up."

- CHS-1 responded "What do you mean?"

- MCKIE responded: "Same thing as the one the other day, just add it up."

- CS responded: "Ok."

During the previous controlled purchase on May 12, 2021, MCKIE charged CHS-1 $500 for an ounce of methamphetamine. Accordingly, I believe that, during this call MCKIE advised CHS-1 that he (MCKIE) would, again, sell CHS-1 methamphetamine for $500 per ounce. When MCKIE advised CHS-1 "Same thing, just add it up," CHS-1 understood this to mean that MCKIE would sell CHS-1 three ounces of methamphetamine for $1,500.00.

16.     At approximately 4:00 pm, following the above-referenced telephone call, RCSD Deputy Dunham observed MCKIE drive to the **STASH HOUSE**.

17.     At approximately 4:03 pm, CHS-1 departed the pre-determined meeting location. CHS-1 was escorted by SA Cavaliere and TFO Owens. At approximately 4:08 pm, RCSD Deputy Dunham observed MCKIE depart the **STASH HOUSE** in the Ford Crown Victoria. At approximately 4:09 pm, RCSD Deputy Dunham observed MCKIE arrive back at the **DISTRIBUTION LOCATION**.

18.     At approximately 6:11 pm, surveillance units observed CHS-1 arrive at MCKIE's **DISTRIBUTION LOCATION** to conduct the controlled purchase of methamphetamine from MCKIE. Immediately following CHS-1's arrival, RCSD Deputy Dunham observed CHS-1 exit

13

CHS-1's vehicle, walk to the back yard of **DISTRIBUTION LOCATION** and conduct the controlled purchase of approximately three ounces of methamphetamine from MCKIE for $1,500 of DEA Official Advanced Funds (OAF).

19.     At approximately 4:13 pm, RCSD Deputy Dunham observed CHS-1 depart MCKIE's **DISTRIBUTION LOCATION**. SA Cavaliere and TFO Owens escorted CHS-1 back to a pre-determined meeting location. At approximately 4:20 pm, TFO Owens, SA Cavaliere, and SA Adam Cornwell arrived at the pre-determined meeting location with CHS-1.

20.     While waiting to conduct the second controlled purchase from MCKIE, surveillance units maintained surveillance of MCKIE's **DISTRIBUTION LOCATION**. Surveillance units observed a high volume of human traffic arriving for short periods of time at the **DISTRIBUTION LOCATION,** which is consistent with drug distribution, and which has consistently been observed throughout the investigation.

21.     At approximately 4:39 pm, CHS-1 conducted another controlled telephone call to MCKIE at **TARGET TELEPHONE 1** (Session #527). Below is a synopsis of the telephone conversation:

- CHS-1 said: "They good man, I can swing back?"

- MCKIE responded "Yeah, what do you want?"

- CHS-1 responded: "The same thing."

- MCKIE responded: "Alright."

- CHS-1 responded: "Ok, I'll be there in a minute."

Based on previous controlled purchases and my knowledge of this investigation, I believe that when MCKIE said, "What do you want?" and CHS-1 said, "Same thing," that CHS-1 was advising MCKIE that CHS-1 wanted another 3 ounces of methamphetamine.

22.     At approximately 4:40 pm, RCSD Deputy Dunham observed MCKIE depart MCKIE's **DISTRIBUTION LOCATION** in the Ford Crown Victoria and drive back to MCKIE's **STASH HOUSE**. RCSD Deputy Dunham observed MCKIE exit the Ford Crown Victoria and enter the front door of the **STASH HOUSE**.[9]

23.     At approximately 4:43 pm, CHS-1 departed the pre-determined meeting location. CHS-1 was escorted by SA Cavaliere and TFO Owens. At approximately 4:49 pm, CHS-1 arrived at MCKIE's **DISTRIBUTION LOCATION** to conduct the controlled purchase of methamphetamine from MCKIE. Upon CHS-1's arrival, RCSD Deputy Dunham observed MCKIE exit his **STASH HOUSE**, enter the Crown Victoria, and drive back to his **DISTRIBUTION LOCATION**.

24.     At approximately 4:50 pm, surveillance units observed CHS-1 conduct the second controlled purchase for methamphetamine from MCKIE for $1,500.00 in DEA OAF.

25.     At approximately 4:51 pm, RCSD Deputy Dunham observed CHS-1 depart the **DISTRIBUTION LOCATION**. SA Cavaliere and TFO Owens escorted CHS-1 back to the pre-determined meeting location, where CHS-1 provided the agents with the approximately three ounces of methamphetamine purchased from MCKIE.[10]

26.     During the investigation, agents have observed MCKIE tell customers that he (MCKIE) had to run around the corner and pick up the product (controlled substances) prior to a drug transaction. The **DISTRIBUTION LOCATION** and the **STASH HOUSE** are located in

---

[9] Between the first and second controlled purchase of methamphetamine from MCKIE, surveillance units maintained surveillance of MCKIE. MCKIE remained at MCKIE's **DISTRIBUTION LOCATION**. On both occasions when CHS-1 requested large quantities of methamphetamine, MCKIE went to the **STASH HOUSE**.

[10] The narcotics obtained from the May 17, 2021 controlled purchases are currently being stored at the RCSD Evidence Room with a hold in the event purity testing is needed and are awaiting laboratory testing.

the same nearby neighborhoods off of Hardscrabble Road. There are only two streets that separate the **DISTRIBUTION LOCATION** from the **STASH HOUSE.** Intelligence gathered during the May 17, 2021 controlled purchase was consistent with intelligence gathered during the interception of **TARGET TELEPHONE 1**; that is, MCKIE picks up methamphetamine for CHS-1 at the **STASH HOUSE** before meeting CHS-1 at the **DISTRIBUTION LOCATION**. Based on the above, there is probable cause to believe MCKIE keeps a larger supply of controlled substances at the **STASH HOUSE**.

## INTERCEPTED TELEPHONE CALLS

27.     On May 14, 2021, MCKIE received an incoming telephone call on **TARGET TELEPHONE 1** from an unidentified male who used telephone number 803-458-6994 (hereinafter referred to as UM6994), during session number 305. Below is a synopsis of the telephone conversation:

- MCKIE: Hello

- UM6994: Yo what's going on man, its Rod?

- MCKIE: What's up?

- UM6994: I can come see you, I'm coming to see you.

- MCKIE: Shit, I'm pulling out the yard man, what you want?

- UM6994: You just pulling out?

- MCKIE: I'm about to, what you want?

- UM6994: Umm, I need, I got five.

- MCKIE: Five what?

- UM6994: Huh.

- MCKIE: Five what?

- UM7994: Five hundred.

- MCKIE: You got five hundred?

- UM6994: Yep.

- MCKIE: Alright.

- UM6994: I'm coming to you right now.

- MCKIE: I'm about to go shoot around the corner and I'll be right back. So come on.

- UM6994: Ok, gotcha.

Based on my training, experience, knowledge of this investigation, knowledge of coded drug language, and intelligence gathered during the investigation, I believe that UM6994 is requesting an ounce of methamphetamine from MCKIE. I believe that when MCKIE said, "I'm about to go shoot around the corner and I'll be right back. So come on," MCKIE was saying that he was going from the **DISTRIBUTION LOCATION** to the **STASH HOUSE** to acquire the drugs for UM6994. Based on an analysis of MCKIE's drug distribution prices, I believe MCKIE sells ounces of methamphetamine for $500.

28.    On May 15, 2021, MCKIE received an incoming telephone call on **TARGET TELEPHONE 1** from Erin MEENAN (hereinafter referred to as MEENAN) who used telephone number 803-667-2935. A synopsis of the telephone conversation is below:

- MCKIE: Hello

- MEENAN: You there?

- MCKIE: Yeah, but it will probably be about 10 minutes before I go in and grab my shit. I got to go to my bitch's house. I'm waiting on her to bring me the damn car[11] now.

- MEENAN: Ok, so come through now or wait?

- MCKIE: Uh, shit I just got to go around the corner and get it at my Ole Lady's house but I'm waiting on her to pull up and bring my damn car.

- MEENAN: Alright I will be there in like 20 minutes then. That's cool?

- MCKIE: Yeah

- MEENAN: Alright

Based on my training, experience, knowledge of this investigation, knowledge of coded drug language, and intelligence gathered during the investigation, I believe that when MEENAN asked, "You there?" MEENAN was asking if MCKIE was at the **DISTRIBUTION LOCATION.** so that MEENAN could purchase drugs from him. I further believe that when MCKIE said, "be about 10 minutes before I go in and grab my shit. I got to go to my bitch's house," MCKIE was informing MEENAN that he (MCKIE) would have to go to his girlfriend WILSON's house, the **STASH HOUSE.** I believe that when MCKIE said, "grab my shit," he was referring to controlled substances at the **STASH HOUSE.** MCKIE also stated that he "just got to go around the corner and get it at my Ole Lady's house," which I believe further confirms that MCKIE had to go to the

---

[11] When MCKIE referenced the "damn car," Agents believe that MCKIE was referring to WILSON's black 2009 Nissan Altima, South Carolina tag TJV683, registered to the **STASH HOUSE** in the SC DMV. Agents have observed WILSON's Nissan at the **STASH HOUSE** on multiple occasions. Surveillance agents have observed MCKIE driving the Nissan Altima and MCKIE has stated in intercepted calls that it is his (MCKIE's) car and that he (MCKIE) purchased it.

**STASH HOUSE** to acquire MEENAN's drug order. Through the course of the investigation Agents found that MCKIE not only refers to WILSON as his "Bitch," but also as his "Ole Lady".

29.     Based on my training, experience, knowledge of this investigation, intelligence gathered during the eight controlled purchases, surveillance, and the referenced intercepted telephone calls on **TARGET TELEPHONE 1**, I submit there is probable cause to believe that MCKIE uses the **STASH HOUSE** as a location to store larger quantities of controlled substances and the **DISTRIBUTION LOCATION** as a location to facilitate his (MCKIE's) drug transactions with customers.   I know from my experience and training that drug distribution locations tend to have a larger volume of human and vehicle traffic due to drug customers coming and going from the location.  Based on intelligence gathered during the eight controlled purchases, surveillance, and the referenced intercepted telephone calls on **TARGET TELEPHONE 1**, agents have observed a consistent large volume of human traffic coming and going to MCKIE's **DISTRIBUTION LOCATION**, and staying there only for very brief periods of time. MCKIE has shown a consistent pattern of behavior of selling drugs from the **DISTRIBUTION LOCATION.**  I believe that MCKIE uses the nearby **STASH HOUSE** to store the bulk of his (MCKIE's) drugs in order to protect his (MCKIE's) product from law enforcement detection and from other drug dealers who may want to rob him.  Agents believe MCKIE's **DISTRIBUTION LOCATION** and **STASH LOCATION** contain drugs, drug proceeds, drug ledgers, evidence of drug trafficking, documents, and other paraphernalia indicative of drug trafficking.

## COUNTRY RESIDENCE

(522 NE Shady Grove Road, Lugoff, South Carolina 29078)

30.    During the course of the wiretap investigation, MCKIE referred to 522 NE Shady Grove Road as "The House," "The Country," and other coded terms. Agents learned through the course of the investigation through surveillance, intercepted calls, and electronic location information that MCKIE uses the **COUNTRY RESIDENCE** as his primary residence. Intelligence gathered during the investigation has shown MCKIE is also known to take drugs from the **COUNTRY RESIDENCE** to the **STASH LOCATION** so that he (MCKIE) can distribute the drugs at the **DISTRIBUTION LOCATION**.

31.    On March 22, 2021, the Honorable Judge Paige J. Gossett, United States Magistrate Judge for the District of South Carolina, signed a court order authorizing the electronic surveillance (location information only) of **TARGET TELEPHONE 1.** During the course of the investigation, the electronic surveillance was steadily maintained. From that information, Agents discovered a pattern of MCKIE's movements/behavior. The pattern indicated that MCKIE spent nearly every late night and early morning at the **COUNTRY RESIDENCE,** and late afternoon into late evening at the **DISTRIBUTION LOCATION**.

## INTERCEPTED TELEPHONE CALLS

32.    On May 16, 2021, MCKIE received in incoming telephone call on **TARGET TELEPHONE 1** from an unidentified male who used telephone number 803-922-6869 (hereinafter referred to as UM6869) during session number 453. Below is a synopsis of the telephone conversation:

- MCKIE: Hello.

- UM6869: Hey, what's up bro?

- MCKIE: Hey, I am trying to get me a ride to my damn grandma's house man.

- UM6869: Where you at?

- MCKIE: I am down here on 601, um, you know where Shady Grove at? You remember where that orange building at "Soda City"? Used to be a motorcycle shop "Soda City". It's down………

- UM6869: I can't remember.

- MCKIE: It's down, it's the next road past Koon Road. You know where Koon Road is at right?

- UM6869: Yeah, I think I remember Koon Road.

- MCKIE: It's the next road, matter of fact I am on the road. It is right at the Kershaw and Richland County line on 601.

- UM6869: Ok, do I come down Screaming Eagle Road?

- MCKIE: It is before you get to Screaming Eagle Road. It's in between Koon and Screaming Eagle. It's right beside the county line. There is a little small bridge right there that has the county line sign by that orange building.

- UM6869: Shoot me the text and I will come get you.

- MCKIE: Alright.

- MCKIE: Call me when you get close to the address because my address will take you across the street. I am going to shoot you my neighbors address.

33.    At approximately 2:37 pm, MCKIE sent UM6869 a text message from **TARGET TELEPHONE 1**. The message listed below was intercepted on Session number 454.

- MCKIE: 530 NE Shady Grove Road Lugoff SC 29078.

34.    At approximately 2:57 pm, UM6869 contacted MCKIE on **TARGET TELEPHONE 1**. The below listed conversation was intercepted on Session #457.

- MCKIE: Yo.

- UM6869: Hey, I'm on that road.

- MCKIE: Which one?

- UM6869: Uh, Shady Grove.

- MCKIE: To U/I dirt road side.

- UM6869: Hmm, no, where that little, that little biker shop is right there where I made the right at? Ok.

- MCKIE: You came from, oh, ok, you supposed to turn on the side where the biker shop at.

- UM6869: Oh, ok, yeah.

- MCKIE: Turn on that dirt road where the biker shop at and when you, and when come up the dirt road there be a mailbox on the right hand side that say 522.

- UM6869: Ok, yeah.

- MCKIE Just come all the way back to the gate, that gate locked, but when you pull up you see them 18 wheelers in the yard so just pull all the way to the back.

During the above telephone communications with UM6869, MCKIE identified his (MCKIE's) address as being off of NE Shady Grove Road. MCKIE also indicated that his neighbor's address is 530 NE Shady Grove Road. MCKIE described certain landmarks and 18-wheeler trucks in the yard of his **COUNTRY RESIDENCE,** which Agents have observed during surveillance operations of the **COUNTRY RESIDENCE**.  MCKIE advised UM6869 to turn at the drive way that has the numbers 522 on the mailbox (his street number).  MCKIE's **COUNTRY**

**RESIDENCE** is in a rural area approximately 40 minutes outside of the City of Columbia. Throughout the investigation, MCKIE often informed individuals that he (MCKIE) was in "the country," when MCKIE was located at the **COUNTRY RESIDENCE.**

35.     On June 22, 2021, MCKIE received an incoming call on **TARGET TELEPHONE 1** from Doyle Allen LOVEJOY (hereinafter referred to as LOVEJOY) who used telephone number 803-397-4135 during session number 3409. Below is a synopsis of the telephone conversation:

- MCKIE: Yeah, what up.

- LOVEJOY: What's up boss man, you going to make it to the country?

- MCKIE: Umm, yeah I probably got a ball[12] and a damn half ball on me right this second. I'm waiting on my, to send my cousin back up to the country to my damn house to grab the rest of the shit. He ain't came back yet.

- LOVEJOY: You, how long you think he will be?

- MCKIE: Um, shit he just left out about 20 damn minutes ago. Hold on, he ain't call me yet when he got up there.

- LOVEJOY: Oh, okay.

- MCKIE: Yeah, um I will call you in just a minute and let you know if uh soon as he pull up.

- LOVEJOY: Alright.

- MCKIE: Okay.

Based on my training, experience, knowledge of this investigation, and knowledge of coded drug language, I believe that when MCKIE informed LOVEJOY, "I probably got a ball and

---

[12] Drug dealers typically use the term "ball" to identify the weight of 3.5 grams. "Ball" is short for "8 Ball" which is an 8th of an ounce, or 3.5 grams. A "half ball" is 1.75 grams.

a damn half ball on me right this second. I'm waiting on my, to send my cousin back up to the country to my damn house to grab the rest of the shit," that MCKIE was advising LOVEJOY that he (MCKIE) only had a small amount of drugs with him at the **DISTRIBUTION LOCATION.** MCKIE told LOVEJOY that his cousin went back to the country (**COUNTRY RESIDENCE**) to pick up the rest of the drugs to bring back to MCKIE so that he (MCKIE) could distribute the drugs to customers such as LOVEJOY.

36.     Based on my training, experience, knowledge of this investigation, court authorized electronic surveillance of **TARGET TELEPHONE 1**, physical surveillance, and intercepted telephone calls, I submit there is probable cause to believe MCKIE uses the **COUNTRY RESIDENCE**, not only as a residence, but also a stash location. Throughout the investigation, MCKIE only allows certain members of his (MCKIE's) DTO to know the actual location of the **COUNTRY RESIDENCE**. MCKIE appears to use the **COUNTRY RESIDENCE** as a safe location for him (MCKIE) to conceal himself from rival drug traffickers and law enforcement detection. Through the investigation when MCKIE detected law enforcement in the area of the **STASH HOUSE** and **DISTRIBUTION LOCATION**, MCKIE regularly departed to safeguard himself at the **COUNTRY RESIDENCE**. Based on intelligence gathered to date, agents believe that MCKIE keeps quantities of drugs, drug proceeds, drug ledgers, other evidence of his (MCKIE's) drug trafficking, documents, and other paraphernalia indicative of drug trafficking at the **COUNTRY RESIDENCE**.

## INDICTMENT

37.     On August 18, 2021, a federal grand jury returned a Sealed Indictment charging Travis Lemett MCKIE, Genesis Chong SOLEDISPA, Eddie Fitzgerald JONES, Michael Leverne

RILEY, Chadwick Christopher JONES, Ian Francis FARLEY, Tyrone KELLY, Jessica MCMANUS, Michael Odell ROWE, Doyle LOVEJOY, And Erin Anne MEENAN, with Conspiring to Possess with Intent to Distribute and to Distribute methamphetamine, cocaine and cocaine base (commonly known as crack cocaine), all Schedule II controlled substances, and heroin, a Schedule I controlled substance; all in violation of Title 21, United States Code, Section 846.

## CONCLUSION

38.    Based upon the foregoing, I request that this Court issue the proposed search warrants, pursuant to Federal Rule of Criminal Procedure 41, to allow the search of the listed properties, more particularly described in Attachment A, including residences, garages, exterior properties, sheds and outbuildings, and the seizure of the items described in Attachment B. Based on the above statements, I believe there is probable cause to find that violations of Title 21, United States Code, Sections 841 and 846 occurred, and that evidence of such violations (described in Attachment B) will be found in the residences, garages, exterior properties, sheds and outbuildings of the properties.

39.    Due to the logistics involved with multiple search warrants at different locations being executed simultaneously, the government requests that the Court authorize execution of the warrants to occur at any time, day or night.

40.    Further, with regard to **DISTRIBUTION LOCATION, STASH HOUSE,** and **COUNTRY RESIDENCE,** permission is sought to allow the Drug Enforcement Administration to obtain the assistance of Federal, State or local law enforcement authorities, in executing the

search of the properties described in Attachment A. Permission is also sought to allow these parties to seize items identified in Attachment B as well as to take photographs or video of any location, item, or individual at the search sites, use water and electrical power at search site, to set up necessary equipment, and to establish safety perimeters as government Agents deem necessary to accomplish the search.

This affidavit has been reviewed by AUSA Jane B. Taylor.

Special Agent Christian L. Cavaliere
Drug Enforcement Administration

SWORN TO ME VIA TELEPHONE OR
OTHER RELIABLE ELECTRONIC MEANS
AND SIGNED BY ME PURSUANT TO
FED. R. CRIM. P. 4.1 AND 4(d) OR 41(d)(3),
AS APPLICABLE

This 23rd day of August, 2021
Columbia, South Carolina.

This affidavit was sworn to by the affiant, who attested to its contents pursuant to
Fed. R. Crim. P. 4.1(b)(2)(A) by telephone after a document was transmitted by
email pursuant to Fed. R. Crim. P. 4.1.

Honorable Shiva V. Hodges
United States Magistrate Judge